ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of -- | ) |
| | ) |
| Sauer Incorporated | )  ASBCA No.  62395 |
| | ) |
| Under Contract No.    W91278-07-D-0030 | ) |

APPEARANCE FOR THE APPELLANT:   Gina P. Grimsley, Esq.
  Counsel

APPEARANCES FOR THE GOVERNMENT:   Michael P. Goodman, Esq.
  Engineer Chief Trial Attorney
 Laura J. Arnett, Esq.
  Engineer Trial Attorney
  U.S. Army District, Savannah

OPINION BY ADMINISTRATIVE JUDGE STINSON
ON THE PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT

Appellant Sauer Inc., (Sauer), appeals a contracting officer's denial of its September 6, 2019, claim, in the amount of $144,780, seeking remission of liquidated damages (R4, tab 2.01).  We have jurisdiction pursuant to the Contract Disputes Act of 1978 (CDA), 41 U.S.C. §§ 7101-7109.  The parties submitted cross-motions for summary judgment, response and reply briefs, and exhibits, to be considered in deciding this appeal.[1]  For the reasons stated below, the government's motion for summary judgment is denied and appellant's cross-motion for summary judgment is granted-in-part.

---

[1] We refer to the parties' motions and briefs as follows:  "gov't mot. ___" refers to the government's motion for summary judgment; "app. cross-mot. ___" refers to appellant's memorandum in opposition to respondent's motion for summary judgment and appellant's cross-motion summary judgment; "gov't resp. ___" refers to the government's response to appellant's statement of undisputed material facts and opposition to appellant's cross-motion for summary judgment; "gov't reply ___" refers to the government's reply in support of its motion for summary judgment; and "app. reply ___" refers to appellant's reply in support of its cross-motion for summary judgment.

STATEMENT OF FACTS (SOF) FOR THE PURPOSES OF THE
PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT

Unless otherwise noted, the following facts are undisputed or uncontroverted.

1.  On August 18, 2006, the U.S. Army Engineer District, Mobile, issued Solicitation No. W91278-06-R-0105, contemplating the award of a Multiple Award Task Order Contract (MATOC), a regional geographic multiple awards indefinite delivery type contract in support of military construction in the South Atlantic Division (R4, tab 3.01 at 0004).  In 2007, the government awarded Sauer MATOC No. W91278-07-D-0030.[2]

2.  On January 12, 2011, the government issued a Request for Proposal (RFP), pursuant to the MATOC, for design and construction of the 82nd Airborne Division Headquarters, in Fort Bragg, North Carolina, Project Number 44968 (the Project) (R4, tab 3.02 at 0002).  The RFP stated that "[t]he scope of work for this Design Build project includes construction and design of a standard design command and control headquarters building" (R4, tab 3.02 at 0003).

3.  The RFP scope of work identified a "primary facility," which included "command headquarters, a joint operations center, a sensitive compartmented information facility (SCIF), conference rooms, classroom space, equipment storage, general storage, mechanical and communications rooms, installation of intrusion detection system (IDS) and connection to energy monitoring and control system (EMCS)" (id.).

4.  The RFP scope of work also identified "supporting facilities," which included, "water and sewer service, electric service, paving and walks, fire protection and alarm systems, exterior lighting, storm drainage, erosion control measures, asbestos removal & lead-based paint remediation as part of demolition, information systems, parking and site improvements" (id.).

5.  Section 3.1.1 of the Task Order Statement of Work provided, in part, "[t]he preferred Command and Control Facility (C2F) is a multi-story stand-alone facility organized around the central core consisting of stairs, elevators, men's and women's restrooms, telecommunication rooms and other support spaces such as break rooms,

_____

[2] In response to the Board's request for a copy of the MATOC, the government submitted a copy of the solicitation that resulted in its award (R4, tab 3.01).  In the accompanying March 27, 2020 letter, entitled Respondent's Corrected Rule 4 Submission, the government informed the Board that it "is unable to locate a viable copy of the award document.  However, the Government does not anticipate a dispute about Appellant's status as a member of the MATOC pool since it was awarded numerous task orders against the MATOC."

2

storage, recycle rooms, etc., as depicted in the preferred functional layout included with this RFP" (R4, tab 3.02 at 0035).

6. Section 6.17.1 of the Task Order Statement of Work provided, in part, "[t]he Government will identify buildings and other existing features to be demolished in the site plans, as applicable to the project" (R4, tab 3.02 at 0180).

7. The RFP included a liquidated damages provision based upon the Federal Acquisition Regulation (FAR), which stated, "[i]n accordance with FAR Clause 52.211-12, Liquidated Damages-Construction, liquidated damages in the amount of $4,365.81 per day shall be assessed if the Contractor fails to complete the work within the time specified in this task order" (R4, tab 3.02 at 0007). The RFP set a duration date of 540 days after receipt of the notice to proceed (*id*.).

8. By letter dated February 7, 2011, the government issued RFP Revision No. 02, which included the following:

> A. CONTRACT CHANGES: The phasing requirement for this project is as follows:
>
> 1. Phase I: Construction of new Headquarters (540 days)
>
> 2. Phase II: Installation of furniture and move into new building (60 days)
>
> 3. Phase III: Demolition of existing building and completion of parking lot areas (100 days)
>
> 4. The overall construction duration for this project has changed from 540 calendar days to 700 calendar days. The paragraph below has been revised to reflect contract duration to 700 calendar days.
>
>> a. In accordance with FAR Clause 52.211-10, Commencement, Prosecution, and Completion of Work, the Contractor shall commence work within 5 calendar days after receipt of notice to proceed, shall prosecute the work diligently and shall complete all work ordered under this task order within the time proposed by the offeror, but not to exceed the maximum allowed 700 calendar days after receipt of notice to proceed.

(R4, tab 3.03 at 0001-0002)

9. On March 1, 2011, Sauer submitted a proposal in response to the RFP (R4, tab 3.04 at 0002). Sauer's proposal included the same liquidated damages provision set forth in the RFP (R4, tab 3.02 at 0007, tab 3.04 at 0006; SOF ¶ 7).

10. By letter dated March 28, 2011, the government informed Sauer that its offer was in the competitive range. The government opened discussions for the purpose of allowing clarifications and submission of a revised cost proposal (R4, tab 3.05).

11. By letter dated April 15, 2011, Sauer submitted its revised proposal (R4, tab 3.07). Sauer's revised proposal included the same liquidated damages provision as set forth in, and required by, the RFP, and as contained in Sauer's initial proposal (R4, tab 3.02 at 0007, tab 3.04 at 0006, tab 3.07 at 0003; SOF ¶¶ 7, 9).

12. On June 13, 2011, the government awarded Sauer MATOC Task Order CV02 (the Task Order) (R4, tab 3.08). The Task Order contained a scope of work nearly identical to the one specified in the RFP (R4, tab 3.02 at 0003, tab 3.08 at 0005; SOF ¶¶ 3-4).

13. The Task Order contained three Contract Line Item Numbers (CLINs) (R4, tabs 3.02 at 0006, 3.08 at 0002-0003). The three CLINs were not specifically tied to each of the Task Order's three phases. CLIN 0001 covered the "[d]esign and related services for the complete design of the 82nd Airborne Division Headquarters and supporting facilities," for a unit price of $2,341,000) (R4, tab 3.08 at 0002). CLIN 0002 covered "[c]onstruction of site work and utilities complete to the five foot line of the building and including the antenna tower, temporary parking and all required building demolition," for a unit price of $4,911,000 (id.). CLIN 0003 covered "[c]onstruction of Division HQ Building Complete to the five foot line," for a unit price of $26,456,000 (R4, tab 3.08 at 0003).

14. The Task Order specified liquidated damages of $4,365.81 per day (R4, tab 3.08 at 0006). The daily liquidated damages rate applied to completion of the project, and was not tied to the contractor's completion of the three separate Project phases identified in RFP Revision No. 02. (R4, tab 3.03 at 0001-0002, tab 3.08)

15. On July 11, 2011, the government issued the notice to proceed, setting a Task Order completion date of June 10, 2013, based upon a performance period of 700 days (R4, tab 2.02 at 0003; gov't mot., ex. A).

16. Phase I - construction of the 82nd Airborne Division Headquarters building - was completed on July 17, 2013 (R4, tab 2.02 at 0004, tab 4.01; gov't mot. at 4 (gov't Statement of Undisputed Material Fact ¶ 13, stating "[o]n 17 July 2013, Sauer completed Phase I, and USACE accepted the 82nd Airborne Division Headquarters building")). The government executed a Transfer and Acceptance of DoD Real Property DD Form 1354

4

stating "[t]his is a partial turnover for the facility," and noting the warranty for the headquarters building was July 17, 2013, to July 17, 2014 (R4, tab 8.01 at 0004-0005). On July 18, 2013, the USACE acknowledged it "turned over the 82nd DIV HQ facility to DPW[3] Real Property on Wednesday, July 17, 2013" and likewise transferred interior keys for the building to DPW (R4, tab 4.02).[4]

17. Phase II - installation of furniture and building move in - was completed on September 15, 2013 (gov't mot. at 5 (gov't Statement of Undisputed Material Fact ¶ 18, stating "[o]n 15 September 2013, Phase II involving furniture installation and move into the new facility from the existing facility was complete")).

18. The Task Order completion date was extended a total of 160 calendar days via eight modifications (R4, tabs 5.01, 5.16 at 0002). Modification No. R00034 contained the final time extension, establishing a Task Order performance period of 860 days (R4, tab 5.16 at 0002), and a revised Project completion date of November 17, 2013 (R4, tab 2.02 at 0003).

19. By letter dated November 15, 2013, the government notified Sauer that

> In accordance with our records, your contract completion date is November 17, 2013. As of the 18th of November and in accordance with the provision of our contract and FAR 52.211 - 12 "LIQUIDATED DAMAGES-CONSTRUCTION", you will be assessed liquidated damages in the sum of $4,365.81 for each calendar day of the delay until the project is completed or accepted.

(R4, tab 4.03)

20. According to the government, Phase III - demolition of existing building and completion of a parking lot – was completed on December 20, 2013 (gov't mot. at 5 (gov't Statement of Undisputed Material Facts ¶ 22)). According to appellant, "the

---

[3] DPW refers to Director of Public Works (R4, tab 4.01 at 0002).

[4] The MATOC contains FAR 52.236-11, USE AND POSSESSION PRIOR TO COMPLETION (APR 1984), which provides that the government may take possession of any completed or partially completed portion of the work, but that such "possession or use shall not be deemed an acceptance of any work under the contract" (R4, tab 3.01 at 0205). The government does not assert or address this clause as a basis for the government's taking possession of property pursuant to Phase I of the Task Order. Appellant mistakenly argues in its brief that "there was no contract clause specifically stating that possession and use does not constitute acceptance" (app. cross-mot. at 14).

government conditionally accepted the parking lot on December 20, 2013" (app. Statement of Genuine Issues of Material Fact at 5 (app. resp. to gov't Statement of Undisputed Material Facts ¶ 22)). A material issue of fact exists regarding the amount of Phase III work left to be performed, or that was performed, from November 17, 2013, to December 20, 2013 (*see* gov't Statement of Undisputed Material Facts ¶¶ 19-21, and app. resp. ¶¶ 19-21). Both parties provide their own characterization of the work being performed based upon citation to Quality Control Reports prepared by appellant during the course of Task Order performance (*id.* (citing R4, tab 6.01)).

21. On January 28, 2014, via Pay Estimate No. 29, the government informed appellant that it was assessing liquidated damages for the period starting November 17, 2013, through December 20, 2013, for a total of 33 days, in the amount of $144,071.73 (R4, tab 7.06 at 0002).

22. Appellant states that 98.7 percent of the total construction-related costs were placed in Phase I, construction of the new headquarters building (app. Statement of Undisputed Material Facts No. 3 (citing R4, tabs 3.03, 3.07; app. mot. at ex. 1)). Although the government "denies" this allegation, it does not state why appellant's determination is incorrect. Rather, the government "notes that the costs associated with the respective schedule activities were assigned by Sauer in its schedule, not determined by the Government" (gov't resp. to app. Statement of undisputed Material Facts No. 3).

23. Appellant states that 1.3 percent of the total construction-related costs were placed in Phase II and Phase III, representing 1.17 percent of the total Task Order price (app. Statement of Undisputed Material Facts No. 4 (citing R4, tab 3.03; app. cross-mot. at ex. 1)). Although the government "denies" this allegation, it does not state why appellant's determination is incorrect. Rather, the government "notes that the costs associated with the respective schedule activities were assigned by Sauer in its schedule, not determined by the Government" (*see* gov't resp. to app. Statement of Undisputed Material Facts No. 3).

24. By letter dated September 6, 2019, Sauer submitted a certified claim to the government challenging the government's assessment of liquidated damages and requesting a final decision from the contracting officer (R4, tab 2.01). Appellant's claim asserted that "[t]he government improperly assessed liquidated damages after Sauer achieved substantial completion and beneficial occupancy" (R4, tab 2.01 at 0004).

25. By letter dated November 20, 2019, the contracting officer issued a final decision denying Sauer's claim (R4, tab 2.02). The contracting officer did not address appellant's argument that assessment of liquidated damages after substantial completion of the Project was inappropriate. Rather, the contracting officer assessed liquidated damages "[i]n accordance with FAR 52.211-12" based upon appellant's "failure to complete the work within the contract duration" (R4, tab 2.02 at 7).

6

26.  Sauer filed its notice of appeal on February 13, 2020.

DECISION

I.  Standard of Review

"Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *First Commerce Corp. v. United States*, 335 F.3d 1373, 1379 (Fed. Cir. 2007).  "The moving party bears the burden of establishing the absence of any genuine issue of material fact and all significant doubt over factual issues must be resolved in favor of the party opposing summary judgment." *Mingus Constructors v. United States*, 812 F.2d 1387, 1390 (Fed. Cir. 1987).

A party challenging a motion for summary judgment "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  It does not matter that the parties have cross-moved for summary judgment, both claiming that there exists no material issue of fact.  *Osborne Constr. Co.*, ASBCA No. 55030, 09-1 BCA ¶ 34,083 at 168,513 ("[e]ach cross-motion is evaluated separately on its merits, and all reasonable inferences are drawn in favor of the defending party; the Board is not bound to 'grant judgment as a matter of law for one side or the other'" (quoting *Mingus Constructors*, 812 F.2d at 1391).

II.  Appellant's Challenge to Assessment of Liquidated Damages is a Government Claim

Appellant seeks remission of liquidated damages, which is a government claim for which "the Government bears the initial burden of proving that the contractor failed to meet the contract completion date and that the period of time for which it assessed liquidated damages is correct."  *KEMRON Envtl. Servs. Corp.*, ASBCA No. 51536, 00-1 BCA ¶ 30,664 at 151,399.  "Once the government has overcome the initial burden, it is incumbent upon appellant to show either that the government incorrectly assessed the damages under the contract, or that appellant's failure to comply with the terms of the contract was excusable." *Chem-Care Co.*, ASBCA No. 53614, 06-2 BCA ¶ 33,427 at 165,726.[5]

---

[5] The Task Order states that liquidated damages "shall be assessed if the Contractor fails to complete the work within the time specified in this task order" (SOF ¶¶ 7, 9, 11).  FAR Clause 52.211-12, Liquidated Damages-Construction, includes terms that are somewhat broader (SOF ¶¶ 7, 19).  Specifically, it provides that "[i]f the Contractor fails to complete the work within the time specified in the contract, the Contractor shall pay liquidated damages to the Government . . . for each calendar

It is well established that "after the date of substantial completion or performance, it is improper to assess liquidated damages." *Gassman Corp.*, ASBCA Nos. 44975, 44976, 00-1 BCA ¶ 30,720 at 151,742 (citations omitted). In its motion, the government states that "[t]his case turns on the question of when a project with three phases . . . achieved substantial completion" (gov't mot. at 1). The government acknowledges that "[l]iquidated damages are not properly assessed on a construction contract after the date the project is substantially completed" (gov't mot. at 8). Although Sauer's certified claim raised the issue of substantial completion, the contracting officer's final decision did not address it (SOF ¶¶ 24-25).

Establishing the date of substantial completion is part of the government's prima facie case, as it bears both on the issue of whether the contractor failed to meet the contract completion date and whether the period of time for which the government assessed liquidated damages is correct. *See Whitesell-Green, Inc.*, ASBCA No. 53938 *et al.*, 06-2 BCA ¶ 33,323 at 165,257 (noting that in discussing whether the government had met its burden "the parties do not dispute the scheduled completion date, the date of substantial completion (beneficial occupancy), and the computation of the amount of liquidated damages"); *Insulation Specialties, Inc.*, ASBCA No. 52090, 03-2 BCA ¶ 32,361 at 160,101 (government established a prima facie case where "[t]he parties agree that the extended contract completion date, through all contract modifications, was 30 December 1995; and, that the date of substantial completion was 30 November 1996"). If the government assessed liquidated damages beyond the date of substantial completion, the government has not met its burden of establishing that the period of time for which it assessed liquidated damages is correct.

III. Task Order Completion vs. Substantial Completion

The parties agree that the Task Order completion date was November 17, 2013 (SOF ¶ 18). Appellant argues, however, that the Project was substantially complete on July 17, 2013, when the government obtained beneficial occupancy of the headquarters building, or, alternatively, no later than November 17, 2013, when the government first assessed liquidated damages (app. cross-mot. at 2).

"Whether a contract has been substantially completed is a question of fact and a project is considered substantially completed when it is capable of being used for its intended purpose." *Maruf Sharif Constr. Co.*, ASBCA No. 61802, 19-1 BCA ¶ 37,239 at 181,276. In making this determination, we focus "upon the specific provisions in the contract that define the parties' expectations regarding the owner's reasonable use of the

---

day of delay until the work is completed *or accepted*." 48 C.F.R. § 52.211-12 (emphasis supplied). The government's November 15, 2013, notification letter includes language contained in the regulation, notifying appellant that liquidated damages will be assessed "until the project is completed or accepted" (SOF ¶ 19).

8

facility." *Id*. We also focus "upon the character and extent of the contractor's partial failure, i.e., the relative importance of that failure to the party affected by it." *Gassman Corp*., 00-1 BCA ¶ 30,720 at 151,742, citing *Thoen v. United States*, 765 F.2d 1110, 1115 (Fed. Cir. 1985). "'[S]ubstantial completion' and 'beneficial occupancy' are used interchangeably, and signify whether the government can continue to hold liquidated damages." *Strand Hunt Constr., Inc.*, ASBCA No. 55905, 13-1 BCA ¶ 35,287 at 173,188. The "interim usage which occurs prior to the completion of a contract is known as beneficial occupancy." *Id*.

"A finding of substantial completion is only proper where a promisee has obtained, for all intents and purposes, all the benefits it reasonably anticipated receiving under the contract." *Kinetic Builder's Inc. v. Peters*, 226 F.3d 1307, 1315-16 (Fed. Cir. 2000). "[T]he doctrine should not be carried to the point where the non-defaulting party is compelled to accept a measure of performance fundamentally less than had been bargained for." *Franklin E. Penny Co. v. United States*, 207 Ct. Cl. 842, 857-858, 524 F.2d 668, 677 (1975).

IV. <u>Substantial Completion of Phase I and Phase II</u>

As originally drafted, the RFP included a 540-day performance period, with no demarcation of Project phases (SOF ¶ 7). The advent of phased construction was a revision to the RFP, which added three phases and three corresponding completion dates, and increased the performance period to 700 days. Under this revised approach, the Project was divided into phases with distinctly-different work items of various sizes and apparent import. (SOF ¶ 8)

The first phase of the Project included work that consumed the vast majority of time and money, i.e., design and construction of the new headquarters building, the Project's "primary facility" (SOF ¶¶ 3, 8, 22). The second and third phases of the Project included distinctly less work in terms of time and money (SOF ¶¶ 8, 23). The second phase included furniture installation in the new headquarters building, along with the government's move into the building, while the third phase included demolition of the old headquarters building and construction of a parking area (SOF ¶ 8). Pursuant to the Task Order statement of work, Phase III included work on "supporting facilities," i.e., "paving and walks" and "parking and site improvements" (SOF ¶ 4).

To the extent RFP Revision No. 02 made no change to the liquidated damages rate in the RFP, i.e., not adding a specific liquidated damages rate for each phase, the dividing of the Task Order into three phases appears to be an artificial edifice, having maintained the single liquidated damages rate set forth in the original RFP (SOF ¶¶ 8, 11). RFP Revision No. 02 likewise did not modify the Task Order CLINs structure, so that the three CLINs corresponded specifically to each of the Task Order's three phases (SOF ¶ 13). Instead, the unit price for design and construction of the headquarters building

9

encompassed both CLIN 0001 (design of headquarters and supporting facilities - $2,341,000) and CLIN 0003 (construction of headquarters building - $26,456,000) (SOF ¶ 13). CLIN 0002 - $4,911,000 – set the unit price of site work and utilities construction outside the headquarters building, and included "temporary parking and all required building demolition" (*id.*).

The government does not dispute that appellant delivered to the government, and the government accepted, Phase I of the Project, four months prior to the completion date, and appellant delivered to the government, and the government accepted, Phase II of the Project, two months prior to the completion date (SOF ¶¶ 16- 17). Yet, the government argues that "the Project was not substantially complete until Phases II and III were completed in December 2013" and that appellant's argument "completely ignores Phases II and III of the contract" (gov't mot. at 7-8). As we already have found, and as the government admits in its Statement of Undisputed Material Fact, Phase II was completed and accepted by the government on September 15, 2013 – two months prior to the November 17, 2013 completion date (SOF ¶ 17). Accordingly, completion of Phase III appears to be the only allegedly long pole left in what was by November 17, 2013, a considerably much smaller tent.

In support of its argument regarding the import of phased construction in the context of substantial completion, the government cites the Corps of Engineers Board of Contract Appeals' decision in *Formal Mgmt. Sys., Inc.*, ENG BCA No. PCC-145, 99-1 BCA ¶ 30,137. The government labels *Formal Management* as "[t]he seminal case[6] that addresses whether a phased construction project can be substantially complete prior to completion of the final phase" (gov't resp. at 10; gov't reply at 12).[7] Quoting *Formal Mgmt. Sys., Inc.*, 99-1 BCA ¶ 30,137 at 149,081, the government states that the decision stands for the proposition that a contractor "has not substantially completed the work where it fails to perform timely a particular aspect of contract work that the parties single out in their agreement and expressly make important to contract performance because of the potential impact on the owner's reasonable use of its facility or on the performance of other owner contracts" (gov't resp. at 10; gov't reply at 13). We agree with the government that *Formal Management* stands for the proposition as quoted, but disagree that the decision supports a finding in its favor.

_____

[6] As for the seminal nature of the decision, we note that a search of *Formal Management* indicates that the decision has been cited by this Board once, namely, in *Gassman Corp.*, 00-1 BCA ¶ 30,720 at 151,742, for the proposition that the "agreement to liquidated damages clause anticipated potential impact on performance." Our search revealed no citation of the decision by any other board or court.

[7] Contrary to the government's assertion, the project in *Formal Management* was not a "phased construction project," rather, as the government later notes, *Formal Management* "involved phases 1-9 for cleaning the Tug/Miter Gates of the Panama Canal" (gov't reply at 12).

10

In *Formal Management*, the contractor failed to complete Phase 10 of the contract, the contract's final phase, which required cite cleanup and demobilization. The contractor challenged assessment of liquidated damages for Phase 10, alleging that Phase 9 constituted the primary purpose of the contract, and therefore, having timely-completed that phase of the contract, the contractor had substantially completed the contract. The Engineer Board rejected the contractor's argument that it had substantially completed the work, noting that the contract singled out Phase 10, which expressly was made important because of the impact non completion of that phase would have on the government's use of the project or on the performance of follow-on contracts. *Formal Mgmt. Sys., Inc.,* 99-1 BCA ¶ 30,137 at 149,081.

The government argues that the parties here likewise "singled out" the importance of Phase III, quoting a portion of the *Formal Management* decision which states "[b]y dividing the contract into ten (10) phases, the parties intended to give each phase an equivalent, substantive status as a contract action for determining when Formal completed each contract phase and when it finally completed the contract" (gov't resp. at 11; gov't reply at 13, quoting *Formal Mgmt. Sys., Inc.*, 99-1 BCA ¶ 30,137 at 149,081). Unlike the Task Order here, however, the contract in *Formal Management* assigned a specific liquidated damages rate to Phase 10, which would apply in the event Phase 10 was not timely-completed. Indeed, the contract only assigned liquidated damages to Phase 9 and Phase 10, and not to the first eight phases, specifically, $5,000 per day for Phase 9 and $75 for Phase 10. *Id*. at 149,077.

As for the import and impact of the contractor's failure to timely complete Phase 10 demobilization, the Engineer Board noted that the contractor had failed to remove its equipment from the site, that the contractor "stored its equipment in an area where the Commission intended to commence construction of a warehouse," and that the government "had other contracts to be performed in the area that were potentially subject to adverse impacts by Formal's failure to complete the contract's Phase 10 demobilization." *Id*. at 149,081. In contrast, the record here suggests no follow-on work to be performed that was impacted while Sauer completed Phase III.

The Engineer Board rejected the contractor's substantial completion argument as it "would necessarily require us inappropriately to read out of the contract the parties' clear agreement to a liquidated damages provision regarding the Phase 10 work," noting that "[u]nder Formal's interpretation, the Phase 10 liquidated damages provision would never apply, since Phase 9 had to be completed before Phase 10." *Id*. at 149,082. The Engineer Board therefore "read the parties' agreement to liquidated damage provisions for Phase 9 and for Phase 10 as reflecting their clear intent that substantial completion encompassed full performance of both Phase 9 and Phase 10." *Id*. That simply is not the situation presented in this appeal. The Task Order here did not assign a specific liquidated damage rate to Phase III, nor did it indicate in any way that completion of Phase III impacted the

11

government's beneficial use of the project, or reflected the parties "clear intent that substantial completion encompassed full performance" of Phase III (*id*. at 149,082). Indeed, the Task Order indicates that Phase III work, included "supporting" activities such as "parking and site improvements," as opposed to construction of the new headquarters, which the government labeled "primary" (SOF ¶ 4).

The government relies also on our decision in *Gassman* for the proposition "that a phased project requires completion of all phases to achieve substantial completion" (gov't reply at 11). The government's reliance upon that appeal is likewise misplaced. *Gassman* concerned a contractor's failure to complete Phase 7 of the contract, which required it to remove a hoisting crane and vacate a staging area prior to another contractor mobilizing on the site for follow-on work. *Gassman Corp*., 00-1 BCA ¶ 30,720 at 151,728. Indeed, the government here, perhaps unintentionally, seems to recognize this important distinction between the facts in Gassman and the facts in this appeal, stating, "the facility was not substantially complete until it was available for its 'intended use' i.e. available for performance of the follow-on contract. Thus, the project achieved substantial completion when the contractor removed the crane and vacated the staging area completing phase 7" (gov't reply at 11). As noted above, the record here indicates no follow-on work waiting to be performed by another contractor at the site, or that the Project was not "available for its 'intended use'" because the parking lot was not complete until December 20, 2013.

The government asserts that, "[b]y parsing the contract into separate distinct phases, the parties agreed that each phase would have functionally equivalent importance regarding performance" (gov't resp. at 12). We disagree. Simply parsing a contract into phases, without more, does not establish the functional equivalence or importance of each phase. The record here contains no evidence supporting a finding that completion of Phase III was functionally equivalent to completion of Phase I or, for that matter, Phase II.

As alleged evidentiary support of its argument as to the import of Phase III completion, the government states that certain "provisions of the contract defined the parties' expectations," namely, the fact that the Task Order work was divided into three phases, each phase had a specific duration, with an overall Project duration of 700 days, and imposition of liquidated damages in the amount of $4,365.81 per day in the event the contractor failed to complete the work at the end of the Project's 700-day duration (gov't mot. at 9).

The government's argument is based, not upon evidence demonstrating the purpose of the Task Order, or an analysis of the cost of performance, or the percentage of work performed, but rather upon the artifice that strict compliance to the completion of all three phases of construction was essential, and all three phases shared equally in significance to completion of the Project. As we already have held, the fact that the Task

12

Order was parsed into phases does not, without more, establish the functional equivalence or importance of each phase. Other than its bare allegation that the existence of a phased contract establishes the singular import of each phase, the government offers no evidence that strict compliance to completion of all three phases truly was "essential." The Task Order provisions cited by the government do not speak to the parties' expectations regarding the owner's reasonable use of the facility, or whether the Project was capable of adequately serving its intended purpose at the time the government claimed the right to assess liquidated damages.

In an attempt to bolster the importance of the Phase III work, the government cites "contemporaneous project records" in which appellant "consistently acknowledged throughout the Project that all three phases of the project were required to be complete within the Project duration of 700 days and that the Project would be complete upon completion of Phase III" (gov't mot. at 10-11).[8] The government points to appellant's Quality Control Reports, which, according to the government, indicate that "in November 2013, Sauer was performing demolition of the old facility where the new parking lot was to be located" (gov't mot. at 11). However, the fact that appellant acknowledged Project phasing and duration, and that it was performing work in November 2013, does not establish appellant's, or the government's, expectation regarding the owner's reasonable use of the facility or that the work performed in November 2013 was essential to the government's beneficial occupancy of the Project.

The government also argues that "[w]hen Sauer completed Phase I and turned over the Headquarters building on 17 July 2013, the Government executed a Transfer and Acceptance of DoD Real Property DD Form 1354 which noted in block no. 4 that it was 'Partial #2'" (gov't resp. at 7). According to the government, the DD Form "listed construction deficiencies including commissioning of the CRAC units and installation and startup of Power Monitoring and management system in TER, NOC, and G2" (*id.*) (citing R4, tab 8.01). However, the government does not explain how these "deficiencies" impacted in any way the government's beneficial occupancy of the Project. Nor does the government explain their import, having formally accepted Phase I in July 2013, and having moved into the new headquarters building two months later (SOF ¶ 8). The government's argument also conflicts with its admission contained in its Statement of Undisputed Material Fact that Phase I and Phase II were "complete" as of July 17, 2013, and September 15, 2013, respectively (SOF ¶¶ 17-18).

---

[8] Appellant does not dispute that the Task Order was divided into three phases, with different durations for each phase, an overall Project completion duration of 700 days, and imposition of liquidated damages based upon overall Project duration (*see* app. resp. to gov't Statement of Undisputed Material Facts Nos. 3-4, as set forth in app. Statement of Genuine Issues of Material Fact).

Appellant is entitled to a grant of summary judgment on the issue of substantial completion only if the government "fails to reference . . . sufficient evidence showing that a reasonable fact finder could decide the 'substantial completion' question in" the government's favor. *J.W. Creech, Inc.*, ASBCA No. 45317, 94-1 BCA ¶ 26,459 at 131,661 ("[b]ased upon an examination of the evidence presented by the Navy and a drawing of all inferences in favor of the Navy, the nonmovant, as required when evaluating a summary judgment motion, a reasonable fact finder could possibly decide the question of 'substantial completion' in favor of the Navy", citing *Anderson*, 477 U.S. at 248–50 (additional citations omitted)). For the reasons stated above, we find that the government has failed to reference sufficient evidence demonstrating that a reasonable fact finder could decide in favor of the government on the issue of substantial completion of Phases I and II. As we discuss below, however, we are unable to make this same determination, in the context of summary judgment, regarding substantial completion of Phase III.

V. Factual Dispute as to Substantial Completion of Phase III

The government asserts that demolition of the former headquarters building, and paving the former site for a parking lot, was part of the benefit of its bargain (gov't mot. at 8, 12). According to the government, "Phase III could not be performed until Phases I and II were completed," and "[a]t the completion of Phase I, the Government had not received all of the benefits for which it contracted - demolition of the prior facility and construction of parking lot areas to serve the new clinic" (gov't mot. at 13). The government notes that "Phase III required Sauer to demolish the 35,514-square-foot existing headquarters building and pave parking lots" (gov't resp. at 8). The government concludes that it "should not be compelled to accept a measure of performance fundamentally less than that for which it bargained" (gov't mot. at 13).[9]

Appellant alleges that other parking areas were available, including an "East Parking Lot" and a temporary parking facilities constructed during Phase I (app. cross-mot. at 14, n.4, app. reply at 5 n.6), although appellant's allegation includes no record citation in support. Regardless, appellant's allegation alone does not refute the government's argument as to the necessity of the unfinished lot. Although we find that Phase I and Phase II were substantially complete, there remains the issue of Phase III substantial completion, i.e., whether demolition of the prior facility and construction of parking areas was an essential part of the Project, and whether appellant's not yet

---

[9] The government argues that "Phases II and III represented approximately 23% or 160 days of the 700-day contract duration" and that "[t]he 60 days added for Phase II were critical to allow the customer to vacate the old building and move into the new building so Sauer could demolish the old building" (gov't resp. at 7-8). However, as we already have found, Phase II also was completed in September 2013 – two months before the Task Order completion date.

14

completing that final task was "fundamentally less than had been bargained for."
*Franklin E. Penny Co.*, 207 Ct. Cl. at 857-858, 524 F.2d at 677.

The parties also disagree as to the amount of work appellant performed on Phase III after November 17, 2013, up until December 20, 2013, as well as whether and when that work constituted substantial completion of Phase III (SOF ¶ 20; app. reply at 8; gov't resp. at 9). Both parties offer a different version of facts regarding the work being performed, based upon their respective characterizations of information contained in appellant's Quality Control Reports (SOF ¶ 20 (citing R4, tab 601)). The divergent positions taken by the parties as to the status of work accomplished and performed on Phase III after November 17, 2013, evidences the existence of disputed issues of material fact. *Dunyami Karakoc*, ASBCA No. 58304, 14-1 BCA ¶ 35,780 at 175,035 ("[a] material fact is one that might affect the outcome of a case") (citation omitted).[10]

In considering the parties' summary judgment motions, our function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Resolution of the status of Phase III work is not possible at this point in the proceedings as it presents a triable issue. *Alderman Bldg. Co., Inc.*, ASBCA No. 58082, 15-1 BCA ¶ 35,841 at 175,272 (on summary judgment, "[o]ur task is not to resolve factual disputes, but to ascertain whether material disputes of fact-triable issues-are present." (quoting *Conner Bros. Constr. Co.*, ASBCA No. 54109, 04-2 BCA ¶ 32,784 at 162,143, aff'd, *Conner Bros. Constr. Co. v. Geren*, 550 F.3d 1368 (Fed. Cir. 2008))). Accordingly, as to the issue of substantial completion of the Project vis-a-vis Phase III, we are constrained at this point in the litigation from making a determination whether it occurred on December 20, 2013, or at some point prior to that date.

VI. Apportionment of Liquidated Damage

In its reply brief, the government "acknowledges that it did not set different rates for each phase of the Project," and "that the [P]roject had one completion date that was extended when time extensions were granted by modification" (gov't reply at 4). In *Dick*

---

[10] In its reply brief, the government argues that the Board "can review Sauer's QCRs [Quality Control Reports], elicit the pertinent facts (uncharacterized or colored by either party), and conclude that Sauer was performing Phase III of the project until 20 December 2013" (gov't reply at 3). However, in its response brief, with regard to whether the Project was substantially complete as of November 17, 2013, the government recognizes that the parties "disagree as to the characterization and significance of the facts and application of the law to these facts" (gov't resp. at 9). Weighing of evidence to decide disputed issues of material facts regarding the status of Phase III from November 17, 2013, to December 20, 2013, is not proper in the context of cross-motions for summary judgment.

*Pacific Constr. Co.*, ASBCA No. 57675 *et al.*, 16-1 BCA ¶ 36,196, we considered the issue of whether the government should have apportioned its liquidated damages where a contractor sought remission of liquidated damages on a Project that was divided into three different deliverable items, but specified only one liquidated damages daily rate. In that appeal, the government took beneficial occupancy in three different phases prior to contract completion, and "the project was accepted 'incrementally.'" *Id*. at 176,627. Yet the government "used a single substantial completion date for the entire project to calculate liquidated damages," and "never considered reducing the liquidated damages based on the incremental acceptance of the work." *Id*. In that appeal, we raised *sua sponte* the issue of whether the government should have apportioned liquidated damages, and calculated apportioned amounts. *Id*. at 176,640.

In finding for the contractor, we held that the "daily rate bears no reasonable relation to the probable loss that would be incurred by the government after" substantial completion of the first two contract items, and that "allowing the daily rate of $2,298 to run after the Rev B Infield and Strat Ramp are substantially complete results in a penalty of $1287 ($843 + $444) per day assessed against DPC." *Id.* at 176,641. Accordingly, we rejected as unenforceable the government's assessment of the full amount of daily liquidated damages after substantial completion of the first two items, and remanded the appeal to the parties to decide quantum. *Id*.

The same reasoning applies to this appeal. Although the issue of substantial completion is a question of fact, the record establishes beyond cavil that at the very least appellant substantially completed Phases I and II, given that the government admits Phases I and II were complete as of July 17, 2013, and September 15, 2013, respectively (SOF ¶¶ 16-17).[11] The government's assessment of the full amount of daily liquidated damages after substantial completion and acceptance of the first two phases is unenforceable.

According to the government, were appellant to prevail, "it would render meaningless the phasing requirements of the contract and the Statement of Compliance signed by Sauer and would force the Government to accept a measure of performance that is fundamentally less than that for which it bargained" (gov't mot. at 2). The government could have included different liquidated damage rates for each of the three phases. For example, in *Pete Vicari Gen. Contractor, Inc*., ASBCA No. 54982, 06-1 BCA ¶ 33,136 at 164,211, the contract included a liquidated damages clause, FAR 52.211-12,

---

[11] The government did not assess liquidated damages for late completion of Phases I and II, nor did the Task Order give the government the right to assess liquidated damages in the event the completion dates of 540, 60, and 100 days for each of the three phases respectively was not met. Indeed, the Task Order only provided for assessment of liquidated damages "if the Contractor fails to complete the work within the time specified in this task order." (SOF ¶ 7)

LIQUIDATED DAMAGES-CONSTRUCTION (APR 1984) - ALTERNATE I (APR 1984), which provided for different liquidated damage daily rates for three different phases of work. The contractor argued that liquidated damages could only be assessed based upon an overall delay in contract completion, and not for untimely completion of individual phases. We rejected the contractor's challenge, finding that the contract "stated that the work was to be performed in three successive phases" with specific days of duration for each phase, and specified different liquidated damages "rates for each phase and not a single rate for the entire contract." *Id*. at 164,211-212.[12]

The government cites *American Int'l Contractors, Inc*., ASBCA Nos. 60948, 61166, 18-1 BCA ¶ 37,061, as an example of when the government did not include separate liquidated damages rates for each phase of a contract, even though the FAR provides a contracting officer "the authority to revise the liquidated damages clause to provide for different rates for separate parts of the work" (gov't reply at 15). Specifically, FAR 11.503(b) provides "[i]f the contract specifies more than one completion date for separate parts or stages of the work, revise paragraph (a) of the clause [FAR 52.211–12, LIQUIDATED DAMAGES—CONSTRUCTION] to state the amount of liquidated damages for delay of each separate part or stage of the work." 48 C.F.R. § 11.503(b).

The government's reliance upon *American Int'l Contractors* is misplaced, as the Board there did not reach the issue of whether the contracting officer should have exercised the authority set forth in FAR 11.503(b) and should have included different liquidated damages rates for each contract phase. The appeal concerned whether the government properly could rely upon FAR 52.211-13, Time Extensions, to justify its imposition of liquidated damages where FAR 11.503(c) instructs that the clause may be used if FAR 52.211-12 has been revised to provide for separate liquidated damages for each part or stage of the work. *American Int'l Contractors,* 18-1 BCA ¶ 37,061 at 180,411. The Board held that although "FAR 11.503(c) requires the insertion of FAR 52.211-13 when the liquidated damages clause has been revised to reflect different liquidated damages amounts for the various stages of the work, it does not prohibit its use in other circumstances." *Id.*

Thus, the Board did not address the issue of whether the government should have included a different liquidated damages rate for each phase of the contract. As for the application and import of FAR 11.503(b) in this appeal, however, the plain wording of that provision suggests that when the government issued RFP Revision No. 02 to provide for phased construction with corresponding completion dates, the government should

---

[12] We also rejected the contractor's challenge to the reasonableness of one of the rates, finding that the appellant "offered no evidence that it was the Phase B rate that was an unreasonable estimate of the damages that might be suffered by the government as a result of delayed completion of the buildings." *Id*. at 164,212.

have revised paragraph (a) of FAR 52.211-12 "to state the amount of liquidated damages for delay of each separate part or stage of the work." The fact that the government did not follow FAR 11.503(b) here is yet an additional argument in favor of a finding that apportionment of the liquidated damages rate is appropriate in this appeal.

We note that the record here does not establish whether the government took beneficial occupancy of any portion of Phase III work prior to December 20, 2013. Assuming the record establishes that Phase III was not substantially complete as of November 17, 2013, the government is entitled to some measure of apportioned liquidated damages from that date, until appellant's substantial completion of Phase III, but no later than December 20, 2013. Appellant is entitled to a reduction of liquidated damages, apportioned, based upon its completion of Phases I and II.

VII. Reasonableness of the Liquidated Damages Rate

Appellant alleges the existence of disputed material issues of fact, specifically "whether the overall rate of $4,365.81/day was reasonable and enforceable as it relates to the completion of Phase III of the project" (app. cross-mot. at 15). Appellant suggests that it "has not yet had the opportunity to engage in discovery regarding USACE's liquidated damages rate, but anticipates being able to demonstrate that USACE's forecast of having the same damages rate for phase I . . . and phase III . . . is excessive and not supportable" (*Id*. at 17). In its reply brief, appellant suggests that discovery is necessary to determine "the factors and circumstances deemed relevant by USACE in calculating the rate used for the entire project, whether USACE followed internal guidelines for establishing a liquidated damages rate, whether the selected guidelines were appropriate for use on the subject Contract, and whether USACE correctly followed such guidelines in calculating a liquidated damages rate for the Project" (app. reply at 4 n.5).

The government responds, stating that the Board lacks jurisdiction to consider the reasonableness of its liquidated damages rate, including "who calculated the rate or how it was derived," because it was not first the subject of a claim submitted by appellant or a contracting officer's final decision (gov't reply at 7-8). The government also argues that this issue is barred by the statute of limitations because six years now have passed since November 15, 2013, when the government notified appellant that it would be assessing liquidated damages for every day after the Task Order completion date of November 17, 2013 (*id.* at 8).[13] Appellant replies that the issue of reasonableness properly is before us, stating that appellant "challenged the entire assessment of liquidated damages in its request for Contracting Officer's Final Decision and Appeal" and that "[t]his is not a materially different claim which has not been raised, but instead a part of the government's liquidated damages assessment that was challenged" (app. reply at 4 n.5).

---

[13] Six years likewise have passed since January 28, 2014, when the government informed appellant of the amount of assessed liquidated damages (SOF ¶ 21).

As noted above, assessment of liquidated damages is a government claim. For a government claim, the decision of the contracting officer "generally defines not only the scope of that claim but circumscribes the parameters of the appeal as well." *AeroVironment, Inc*., ASBCA Nos. 58598, 58599, 16-1 BCA 36,337 at 177,177-178. In the context of a government claim, the final decision limits the scope of what the government may assert and what relief it may seek. The question presented here, however, is assuming the government has established its prima facie case, whether a contractor may assert as a defense to the government claim evidence that the liquidated damages amount asserted by the government was unreasonable. *KEMRON Envtl. Servs. Corp*., 00-1 BCA ¶ 30,664 at 151,399 (once government established prima facie case that liquidated damages are warranted burden shifts to the contractor "to establish a valid defense").

In *Honeywell, Inc*., ASBCA No. 47103, 95-2 BCA ¶ 27,835 at 138,792, the appellant was permitted to challenge the government's interpretation of a Cost Accounting Standard (CAS) provision and its application to eleven of appellant's business closing segments, even though the final decision on the government's claim covered only one segment. Appellant alleged that the government, in computing its CAS adjustments of appellant's previously-determined pension costs, had "adopted inconsistent positions on different segment closings" and that conclusions reached in various DCAA audit reports were "logically and legally irreconcilable."

We found that, if what appellant alleged was true, it "would affect the merits of the Government's claim and call into question the Government's interpretation and application of the relevant CAS provisions." *Id.* We held, therefore, that although the contracting officer's decision did not support a finding of jurisdiction over pension cost issues related to the closing of other segments not addressed in the decision, the appellant's challenge to the government's interpretation and application of the CAS provision as to all eleven segments could be "litigated as an affirmative defense, without any need to expand the scope of the appeal," and that appellant would be "afforded an opportunity to amend its pleading to assert any defenses it may have to the Government's claim." *Id.*

Our analysis in *Honeywell, Inc*., finds appropriate application to the facts here. Appellant has the right to assert what is, in essence, an affirmative defense to the government's assessment of liquidated damages. Regardless of the discovery appellant claims is necessary as to the reasonableness of government's determination of the liquidated damages rate pre-award, or the government's jurisdictional argument as to that determination, appellant here also challenges the reasonableness of the government's decision not to apportion that rate, even though appellant had completed Phases I and II (app. cross-mot. at 15). On the issue of apportionment of liquidated damages, we have found for appellant. Our decision on the parties' cross-motions for summary judgment

turns not on the reasonableness of the liquidated damages rate as established by the government pre-award (nor are we able to decide that factual dispute on summary judgment), but, rather, on the government's failure to apportion its liquidated damages at the time it assessed those damages.

The government correctly states that appellant's complaint does not address the reasonableness of the government's liquidated damages rate (gov't reply at 8). Board Rule 6(d) provides for amendment of pleadings "upon conditions fair to both parties" and that "[i]f evidence is objected to at a hearing on the ground that it is not within the issues raised by the pleadings, it may be admitted within the proper scope of the appeal, provided however, that the objecting party may be granted an opportunity to meet such evidence." Given our decision here, appellant must decide what additional steps, if any, are necessary to properly tee up its affirmative defense for resolution in this appeal.

CONCLUSION

For the reasons stated above, the government's motion for summary judgment is denied. Appellant's cross-motion for summary judgment is granted-in-part on the issue of appellant's challenge to the government's assessment of liquidated damages and its failure to apportion liquidated damages based upon appellant's substantial completion of Phases I and II of the Task Order. Appellant's motion is denied-in-part due to the remaining factual issues regarding substantial completion of Phase III and proper apportionment of the liquidated damages rate.

Dated: April 16, 2021

DAVID B. STINSON
Administrative Judge
Armed Services Board
of Contract Appeals

(Signatures continued)

I concur                                    I concur




_____            _____
RICHARD SHACKLEFORD                         OWEN C. WILSON
Administrative Judge                        Administrative Judge
Acting Chairman                             Vice Chairman
Armed Services Board                        Armed Services Board
of Contract Appeals                         of Contract Appeals


I certify that the foregoing is a true copy of the Opinion and Decision of the
Armed Services Board of Contract Appeals in ASBCA No. 62395, Appeal of Sauer
Incorporated, rendered in conformance with the Board's Charter.

Dated:  April 16, 2021


_____
PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals

21